LEWIS T. CURTIS v. CALEB C. AARONSON ET AL.

1. The construction of deeds and other writings in evidence in a cause rests with the court as a duty as well as a right, and in construing a grant of lands, if there is nothing in the description to control the call for courses and distances, the land must be bounded by the courses and distances called for.

2. If a grant by sufficient description clearly ascertains the location of the premises conveyed, it is for the court to see that the grant is applied to the subject matter in accordance with the expressed intention of the parties.

3. Where monuments are called for in the description, inconsistent with the calls for courses and distances, it is a familiar rule that courses and distances must yield to the monuments.

4. The return and map of the deputy surveyor are competent evidence in a case where a boundary is in dispute.

5. In cases of a private nature, recitals of fact not made by one in possession as owner and qualifying such possession, not made by an owner against interest, not made by one in the performance under proper authority of some proveable act in respect to such boundary, and qualifying and characterizing such act, are hearsay and inadmissible in matters of private boundary, but being the mere voluntary statement of a stranger, not under oath, or in the presence of parties, can-

not, under any rule of reason or safety, be regarded as competent testimony upon which to determine private title to lands, and whether made *ante* or *post litem motam,* are equally objectionable and illegal.

---

On error, to the Burlington Circuit Court.    The facts fully appear in the opinion.

Argued at February Term, 1886, before BEASLEY, CHIEF JUSTICE, and Justices VAN SYCKEL and KNAPP.

For the plaintiff, *C. E. Hendrickson.*

For the defendants, *Jos. H. Gaskill* and *M. R. Sooy.*

The opinion of the court was delivered by

KNAPP, J.   This action was trespass *quare clausum fregit.* The contest at the trial was over the true location of the southerly boundary line of a tract of land known as the Abram Jones including survey, the plaintiffs claiming it to be so far south as to include the *locus in quo,* the defendants claiming it to be further north and running so as to exclude from the boundaries of said survey the lands upon which the cutting was done and which they claim under a later survey, known as the Heisler survey.   The parties to the controversy are agreed as to the beginning point of the Jones survey, and on the lines of course to the end of the fifteenth course, and the termination of that course at an established monument described in the survey as a pine tree by Egg Harbor road, marked in letter W.   The corner is now described by a small stone marked with letters C. N. at the foot of the pine tree. From this monument the survey calls for its sixteenth course— south, twenty-four degrees east, twenty-nine chains to a corner; then seventeenth, south, sixty-five degrees and fifteen minutes west, one hundred and fifty-one chains and fifty links to a pine tree, marked letters A. I., standing on the east side of a branch called Shoal branch; thence down the several courses thereof, &c.

The sixteenth course forms the eastern boundary line of said tract. The seventeenth course, the southerly boundary, which is in dispute. Defendants run the seventeenth line from the end of twenty-nine chains from the C. N. corner on the line of course called for in the survey, and strike the stream at a point where they claim to find evidence of the location of the A. I. monument. The plaintiff, by his testimony, locates the A. I. monument at a point on the stream southerly of that fixed by the defendants, and where a line drawn from the end of the twenty-nine chains to that point would vary, in a southerly direction, some twelve degrees from the line of course called for in the survey.

Upon the assumption that the plaintiff's location of the A. I. monument was the correct one, he claimed that the corner formed by the sixteenth and seventeenth courses should be ascertained by running the courses called for in the survey from the two fixed monuments to their point of intersection, disregarding the distances called for in the survey. The result of this would be to extend the sixteenth line of course of twenty-nine chains, as called for, to ninety-six chains and fifty links. As before shown, the Jones tract, thus bounded, would include the later survey, under which defendants claim, while a line drawn from the end of the twenty-nine chains to the A. I. monument, as claimed by the plaintiff, would pass through the Heiser survey.

The judge left it to the jury to say whether the plaintiff's or the defendants' location of the A. I. monument was the correct one. But, in interpreting the calls of the grant, he instructed the jury, as a matter of legal exposition, that under the language of the survey the sixteenth line must stop at the end of twenty-nine chains from the C. N. stone; that the length of the chain fixed the end of the sixteenth line at twenty-nine chains; that from there the seventeenth line must be run, regardless of courses or distances, to the point where they should find the true location of the A. I. monument to be. This instruction of the court was excepted to, and is the foundation of several assignments of error.

The construction of deeds and other writings in evidence in a cause rests with the court as a duty as well as a right. And in construing a grant of lands, if there is nothing in the description to control the call for courses and distances, the land must be bounded by the courses and distances called for. If a grant by sufficient description clearly ascertains the location of the premises conveyed, it is for the court to see that the grant is applied to the subject matter in accordance with the expressed intention of the parties. *Jackson* v. *Perrine*, 6 *Vroom* 137.

When monuments are called for in the description inconsistent with the calls for courses and distances, it is a familiar rule that courses or distances, or both, must yield to the monuments. *Opdyke* v. *Stephens*, 4 *Dutcher* 83.

But (to quote from the language of Chief Justice Green, in Opdyke *v.* Stevens), " where there is a latent ambiguity in the description contained in the deed, all the cases agree that evidence *aliunde* is admissible. It is admissible in all cases where there is a doubt as to the true location of the survey, or a question as to the application of the grant to its proper subject matter. It must be constantly borne in mind that it is not a question of construction, but of location. A question of construction is a pure question of law, to be decided by the court upon the terms of the instrument itself, to the exclusion of evidence *aliunde*, where no latent ambiguity exists. A question of location, or the application of the grant to its proper subject matter, is a question of fact to be determined by the jury by the aid of extrinsic evidence."

Whenever the location of premises is doubtful, through uncertain, inconsistent or conflicting terms of description in the deed, the proper location of the premises becomes a question of fact to be determined by the jury on all the evidence.

The question in the case is whether there appears a well-grounded doubt as to the true location of these premises, arising out of either an uncertain, insufficient or inaccurate description in the deed, such as should have carried the whole matter of location as a question of fact to the jury. A slight

examination of the evidence in the case suffices to show uncertainty in applying this grant to the lands. Surveyors, in running the exterior lines, while they found the courses approximately accurate, found little or no guide in the distances given in the deed, but in reaching monuments called for were obliged to make measurements grossly in excess of those called for in the description. All the monuments called for in the tract become of the utmost importance in determining extent in the survey. Upon the point principally controverted there was much evidence offered in the case to establish the A. I. monument at the point claimed for it by the plaintiff. To place it there and preserve the courses of the two lines intervening between that and the C. N. monument, required that those courses should be run from each monument to a point of intersection. This method of survey was approved by the testimony of surveyors and engineers of reliable character and experience. True, it would have increased the length of the line of the sixteenth course. But such increase presents no novelty in this survey. The seventeenth course, or southerly line of the tract, whether that claimed by the plaintiff or defendant be adopted, was on length of line largely in excess of the call in the survey. A line run from the end of the twenty-nine chains in the sixteenth course to the A. I. monument, as claimed by the plaintiff, would still increase the line. The method of surveying by reverse courses to ascertain lost corners, or to correct the lines of a survey, is one in use and often indispensable in removing errors in description, and has received approval in the courts. *Fuller* v. *Carr*, 4 *Vroom* 157.

Another circumstance was shown in the case tending to throw doubt on the correctness of the length given of the sixteenth line of course. In the Jones location, which was an including survey, several prior locations were excepted from the grant. Some of these surveys which would be within the tract, as claimed by the plaintiff, would be outside of any boundary line run from the end of twenty-nine chains and either of the claimed A. I. monuments. This circumstance, however it may have been weakened by other evidence in the

cause, was still pertinent evidence for the plaintiff, and with the other matters referred to was calculated to throw such doubt on the correctness of the length of line given in the survey for the sixteenth course as to remove the determination of that matter from the domain of the court and carry it to the jury with the other matters of fact to be determined by them.

The direction of the learned trial judge would have been unobjectionable if defendants' view of the position of the A. I. stone had been unquestioned in the case. He would have thus given effect to the clear, unquestioned terms of the grant. But when the weighty evidence presented by the plaintiff to give that monument the position claimed for it by him, an error in the description of one or the other of the lines between the two monuments was made manifest. Either the length of the sixteenth line must be extended to meet a reverse line from the monument so established by the plaintiff, or the course of the seventeenth line must be materially changed in direction as well as increased in extent.

There was room, then, to give effect to the superior value of courses over distances. At all events there was a doubt to be resolved, an error to be corrected, which reached beyond any relief which mere interpretation of the descriptive terms in the deed could afford.

I am quite persuaded the solving of the doubt thus raised, and the correction of this apparent error should have been committed to the jury upon the extrinsic evidence in the cause. I entertain some doubt whether, under the circumstances, the defendant had suffered any substantial injury to his rights by the direction of the judge for the reason that having submitted to the jury to decide upon the true location of the A. I. monument, their verdict would indicate that they had found with the defendants on that point. But I think it cannot be safely said that the plaintiff did not suffer injury by this judicial action. I think it was calculated to lead the jury from a due consideration of the evidence tending to establish the line and monument as claimed by him and threw

into the scale of the defendants the persuasive force of the fact made apparent to them that in all parts of this survey the courses given in the grant were proved to be substantially correct by subsequent running. They might have concluded, and that not unreasonably, that this line, starting where it might, should be run according to the course called for locating the corner at the end of the twenty-nine chains, greatly favored the claim of the defendants.

The second class of exceptions relates to the charge of the judge as to the effect of the return and map of the deputy surveyor. The instruction was that the deputy's return could not be used to contradict, alter or control the clear language of the survey. And again, upon the same point, on the refusal of the request to charge that " the return and map of the deputy who made the survey are always admissible to explain the calls of the survey, and in this case it is admissible to explain the nature of the corner called for at the end of the sixteenth line of the said survey, namely, that the said corner was a post." As to the charge, that was perhaps a correct statement of the law—where the language of the location of the survey is clear that the deputy's return cannot vary or contradict it. And, if this be so, the request to charge was somewhat too broad. I do not understand the trial judge to have declared that the return and map made by the deputy were not competent evidence in a case where boundary is in dispute. Regarding the sixteenth line as one in doubt as to its true location, I think it is clear that such map and return are competent evidence, and might be referred to to shed such light on the true location as they afford.

The third class of exceptions relates to the overruling and withdrawal from the jury of the evidence of declarations of deceased persons with reference to the corners and boundaries in dispute in the case. The ground of the exclusion of this testimony was that such declarations were made after controversy had arisen touching the questions at issue in that suit.

The testimony shut out under this ruling was hearsay, and would, on that ground, have been properly excluded under the

general rule against the admission of hearsay evidence, unless it comes under some exception permitting testimony of this character in matter of boundaries.

James Lippincott, one of the witnesses, was allowed to testify that Thomas Haines and Joseph R. Hulme had conversed with witness about thirty years before the trial, concerning the location of the A. I. monument. And Hulme, in the conversation with him, stated that the A. I. stone (claimed by plaintiff) was a corner of the Jones mill survey. That Haines, in the conversation which witness had with him, "told him the same in substance, that the A. I. stone was a corner to the original Abraham Jones survey." There was other testimony of the same character. Neither Hulme nor Haines were ever the owners of or in possession of the land in controversy. The conversation related was not on or near the lands, nor while declarants were engaged in any act concerning the disputed line or corner. The testimony was received under the defendants' objection that it was hearsay evidence.

If the evidence received was competent proof of the fact declared by these aged persons, it covered a very important point of inquiry in the case.

There was no possibility of disproving the declarations; and the defendants were bound up to their unqualified acceptance, without power to go deeper, by cross-examination, than the circumstances attending the conversation which evolved the statement.

It is said, on behalf of this evidence, that it is admissible under an exception to the general rule excluding hearsay, which permits proof of boundaries by ancient reputation.

Such declarations seem to me not to belong to that class of evidence.

It is familiar practice to receive evidence of the declarations of parties in the possession of lands as owners, made against their interest, to bind such owner and those claiming under them. *Van Blarcom* v. *Kip*, 2 *Dutcher* 351; *Horner* v. *Stillwell*, 6 *Vroom* 310.

The declarations of such owner when engaged in pointing out his boundaries, as well as the declarations of surveyors and others acting in the same manner under competent authority, would be admissible when the act was one relevant in proof, as of the *res gestœ*, if such declaration gave character to the act proved. But the practice of receiving evidence like this in question, on deliberation, in our trial courts is unfamiliar, and we are unable to find any authority for its admission in the reported cases in our state. *Ten Eyck* v. *Runk*, 2 *Dutcher* 513, is a decision against it.

Some countenance for its admission is claimed, under the language used by Chief Justice Green, in deciding Opdyke *v.* Stephens. "Boundaries," he says, "may be proved by every sort of evidence that is admissible to prove any other fact: actual occupation, ancient reputation, the admission of the party in possession against his interest, &c." Doubtless proof of boundaries by ancient reputation has a place in the law of evidence. But the learned Chief Justice was not then attempting to point out the conditions requisite to the admission of such evidence.

The admissibility of evidence of common reputation, to prove ancient facts of a public or *quasi* public nature, is a recognized exception to the rule excluding hearsay evidence.

In England, on questions of ancient public boundary, this source of evidence was commonly resorted to. Knowledge of such public matters was supposed to rest in the possession of the public, because of their interest therein, and in any litigation touching such subject, the parties to it had a common resort for ascertaining the truth. And there it has not been infrequent, where private lines in dispute were coincident with public or *quasi* public boundaries, to admit evidence of reputation in determining the private right.

The rule, to the same extent, has general prevalence in the states of this country. 1 *Greenl. Ev.* 145; *Whart. Ev.*, § 185; *Regina* v. *Bedfordshire*, 4 *E. & B.* 535.

No such exception to the general rule has ever been recognized in England in respect to the determination of mere pri-

vate boundaries, for the reason that such private interests could not be matter of knowledge with the public, or of any public interest or concern.

It has therefore been the course of the courts there to entirely exclude traditionary evidence in suits concerning private lines and monuments. *Outram* v. *Morewood,* 5 *T. R.* 121 ; *Didsbury* v. *Thomas,* 14 *East* 323, and cases cited in note ; *Clothier* v. *Chapman,* 14 *East* 331 ; *Dunraven* v. *Llewellen,* 15 *Q. B.* 791.

In some of the American states the rule excluding hearsay testimony is, in this line of fact, to some extent departed from, and traditionary evidence is received to establish private boundary. It has been permitted, under color of making proof by ancient reputation, to give the declarations of third persons, strangers to the title, made when not engaged in any provable act, such declarations being recitals of past acts and doings of the declarant, or expression of opinion on matters exclusively pertaining to the rights of others.

The reception of such evidence is confessedly in derogation of the established rules of evidence under our system, and is justified only on the ground of an alleged necessity.

It is needless to cite these cases, as they are fully referred to in the text-books in common use.

But the decided weight of authority in the country, and upon the solid ground of reason and principle, is against the admissibility of evidence of this character.

The cases decided in the courts of Massachusetts illustrate and enforce what is believed to be the true rule.

There traditionary proof is received in matters of private lines only when the boundary in question is a public or *quasi* public one, with which the private right is coincident.

Proof of declarations of persons since deceased, in respect to private boundaries, to be admissible in evidence, must have been made by a declarant in possession as owner at the time, and while engaged in pointing out the boundary in question, and such declarations need not be against interest or in disparagement of title ; they are received when nothing appears

to show an interest to deceive or misrepresent. *Daggett* v. *Shaw*, 5 *Metc.* 223; *Bartlett* v. *Emerson*, 7 *Gray* 174; *Ware* v. *Brookhouse*, 7 *Gray* 454; *Long* v. *Colton*, 116 *Mass.* 414; *Whart. on Ev.* 191.

The rule in Massachusetts is approved in the federal courts. *Hunnicutt* v. *Peyton*, 102 *U. S.* 333, 363.

It may not, in every instance, be readily determinable whether a disputed boundary is of such public character as to permit evidence of reputation concerning it. In the case of lines of counties, towns, townships, highways, large water-courses, and the like, there can be no doubt. But there may be lines and monuments of a less marked public character, and yet, by reason of their relation to numerous minor titles and land divisions, a local public interest may arise, and a consequent knowledge in the neighborhood concerning them may be readily supposed to exist. Such cases it is believed come within the rule.

But we think the subject matter of investigation in this case is not shown to have such *quasi* public quality. It is strictly of a private nature.

In such cases, recitals of fact not made by one in possession as owner and qualifying such possession, not made by an owner against interest, not made by one in the performance under proper authority of some provable act in respect to such boundary, and qualifying and characterizing such act, but being the mere voluntary statement of a stranger, not under oath, or in presence of parties, cannot, under any rule of reason or safety, be regarded as competent testimony upon which to determine private title to lands, and whether made *ante* or *post litem motam*, are equally objectionable and illegal; and while the courts of some states have, as it would seem, been willing to receive such testimony, in this state we have not gone so far.

The case of Ten Eyck *v.* Runk, cited above, decided in the Court of Errors of this state, in 1853, was supposed to have ruled adversely to the admission of this class of testimony in matter of private right. The case was decided when Chief

Justice Green was a member of that court, and the language used by him in Opdyke *v.* Stevens, read in the light of this case, does not lead to the belief that he held a different view of the rule of evidence in question.

The court below, in overruling the evidence of Lippincott and others of the class, committed no error, but the judgment should be reversed, and a new trial ordered, for error in the direction of the court below, above pointed out.